# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DENIS GRAY TRUCKING, INC., CARMICHAEL LEASING CO., INC. d/b/a CARMICHAEL NATIONALEASE, and GTL ENTERPRISES INC., on behalf of themselves and all similarly situated persons and entities,<br><br>       Plaintiffs,<br><br>  v.<br><br>NAVISTAR INTERNATIONAL CORPORATION,<br><br>       Defendant. | CASE NO.<br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>(JURY DEMAND) |

Plaintiffs Denis Gray Trucking, Inc., Carmichael Leasing Co., Inc. d/b/a Carmichael NationaLease, and GTL Enterprises Inc. ("Plaintiffs") on behalf of themselves and all other similarly-situated persons and entities, by and through their designated attorneys, bring this class action complaint against Navistar International Corporation ("Navistar"). All allegations in this Complaint are based upon the investigation of counsel, including preliminary expert work, except the specific allegations pertaining to the named Plaintiffs, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action for unfair, unlawful, and fraudulent business practices, breach of express and implied warranties, and related claims, on behalf of themselves and all current and former purchasers and lessees nationwide of 2008-2013 model year Navistar vehicles equipped with Maxxforce Advanced EGR diesel Engines (the "Maxxforce Engines" or "Engines") (the "Class" or "Classes").

2.     The action arises from Navistar's failure to disclose to, and active concealment from, Plaintiffs and all Class members that the emissions system designed into the Maxxforce Engines is defective and leads to repeated failures (the "Defect"), and Navistar's failure to properly repair the Defect during the warranty.  As a direct result, trucks equipped with the defective Engines were not as represented by Navistar and were and are worth less than the price Plaintiffs and Class members paid, and what they would have been worth with an engine free from defects.  In other words, Plaintiffs and Class members did not get what they paid for.

3.     Navistar sold trucks containing the defective Maxxforce Engines under its International brand name, including but not limited to the following models (collectively the "Trucks"):

      a.     International Prostar and Lonestar, which are heavy duty, long haul tractor trailer trucks;

      b.     International Transtar, a heavy duty, regional haul truck;

      c.     International Workstar and Paystar, severe duty trucks used for construction applications, for example as dump trucks; and

      d.     International Loadstar, a severe duty cab forward truck used for various applications, including garbage trucks and airplane refueling trucks.

4.     All of the Trucks are U.S. Department of Transportation Class 7 and 8 trucks, the largest, heaviest, and most powerful on the road.

5.     The Maxxforce Engines have failed or are substantially certain to fail well before their intended and expected useful life.  Many owners and lessees of Trucks containing the Maxxforce Engines have already had to repeatedly repair or replace the EGR systems and/or

other parts damaged by EGR system failure, often at their own expense, and often after Navistar failed to properly repair them during the warranty.

6. The Defect also rendered the Maxxforce Engines unreasonably dangerous at the time they were purchased. The Defect can and has led to sudden breakdowns, forcing Trucks, often heavily loaded with cargo, to attempt emergency maneuvers, such as pulling to the side of the road. The Defect also causes coolant and exhaust fumes to enter the passenger compartment of the Trucks, causing risks of driver poisoning from the fumes.

7. When owners and lessees, including Plaintiffs, presented the Trucks for repair within the warranty period, Navistar failed to properly repair the emissions system and/or replaced it with another equally defective and failure-prone system, never properly remedying the Defect.

8. Because the Defect in the Maxxforce Engines exists at the time of sale, and manifests both within and outside the warranty period – and given Navistar's knowledge of the Defect – any attempt by Navistar to limit its warranty obligations with respect to the Defect is unconscionable, and any limited or exclusive remedy fails of its essential purpose.

9. On behalf of themselves and all Class members, Plaintiffs seek an award of compensatory damages against Navistar for its intentional, willful, and/or negligent failure to disclose and/or concealment of the inherently defective and dangerous condition posed by the Maxxforce Engines, and failure to honor its warranty obligation to properly repair the Defect.

## PARTIES

10. Plaintiff Denis Gray Trucking, Inc. ("Denis Gray") is a Washington corporation with it principal place of business in Puyallup, Washington. Denis Gray purchased Navistar vehicles in the State of California.

11.     Plaintiff Carmichael Leasing Co., Inc. d/b/a Carmichael NationaLease ("Carmichael") is an Illinois corporation with its principal place of business in Chicago, Illinois. Carmichael purchased Navistar vehicles in the State of Illinois.

12.     Plaintiff GTL Enterprises Inc. ("GTL") is a Washington corporation with its principal place of business in Othello, Washington. GTL purchased Navistar vehicles in the State of Washington.

13.     Defendant Navistar International Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 2701 Navistar Drive, Lisle, Illinois 60532. As such, Navistar is a citizen of both Delaware and Illinois. Service of process may be accomplished on Navistar through its registered agent for service of process, Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

14.     This Court has original subject matter jurisdiction over this Class Action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of Washington and Illinois who purchased their vehicles in Washington, California, and Illinois. Pursuant to 28 U.S.C. §§ 1332(c) and (d)(10), Navistar is a corporation organized under the laws of Delaware, with its principal place of business in Illinois. As a result, the named Plaintiffs, Class members, and Navistar are citizens of different states within the meaning of 28 U.S.C. § 1332(d)(2)(A).

15.     On information and belief, the proposed Class exceeds 100 persons. Pursuant to 28 U.S.C. § 1332(d)(6), the aggregate amount of the Class members' claims substantially exceeds $5,000,000, and thus, exceeds the requisite amount in controversy set forth in 28 U.S.C. § 1332(d)(2). Additionally, because, inter alia, Navistar is the only party named in this cause

from whom any relief is sought by the named Plaintiffs and the proposed Class members, the "local controversy exception" and "home state exception" to jurisdiction under 28 U.S.C. § 1332(d)(2), as set forth under 28 U.S.C. § 1332(d)(4)(A) and (B), do not apply here.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), (b) and (c) on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.     Background

17.     Navistar is a holding company with subsidiaries and affiliates that produce commercial trucks and diesel engines, and provide parts and service for those vehicles and engines.

18.     $8.6 billion of Navistar's $11.5 billion net sales worldwide in 2009 was derived from the North American truck and engines market.  Class 8 trucks, including those at issue here, comprise a substantial majority of Navistar's truck and engine revenue.  For example, in 2009, Navistar delivered 181,800 units in the North American truck market, of which 119,400 were Class 8 trucks, representing a 32% retail delivery market share.  Navistar's Class 8 engine offerings include 11-, 13-, and 15-liter diesel engines.

19.     In 2000, the U.S. Environmental Protection Agency ("EPA") announced that it would, for trucks manufactured for the 2010 model year forward, impose new, strict emissions standards ("2010 EPA Standards").  Every manufacturer selling commercial trucks in the U.S. except Navistar chose to meet the 2010 EPA Standards with Selective Catalytic Reduction ("SCR"), which treated engine exhaust with a urea-based chemical after it left the engine.

20.     Navistar chose a different technology to meet the 2010 EPA Standards, Exhaust Gas Recirculation ("EGR"), which reduced emissions by subjecting exhaust flowing out of the

engine to a second burn in the cylinders. Navistar's system diverted some of the exhaust into an EGR cooler, which used ordinary engine coolant to lower the exhaust temperature. The cooled exhaust was then fed back into the engine's air intake through the EGR valves.

**B.  The Nature of the Defect**

21.  While many commercial and passenger engines use EGR systems of some kind, no manufacturer had ever produced an engine that recirculated such a large percentage of engine exhaust into the cylinders. Because of the additional recirculated exhaust, Navistar's Advanced EGR system generated far more heat within the engine than in the SCR engines of Navistar's competitors.

22.  The Advanced EGR systems cannot handle the amount of heat and pressure they generate, leading to broken EGR valves, exhaust leaks that melt and destroy other engine components, and EGR cooler failures, which send uncooled exhaust gas back into the engine (causing the computer to shut down the engine). The Defect also can cause the EGR cooler to leak coolant through the EGR valves into the engine. The added stress of having non-flammable coolant pushed out the exhaust valves in the cylinder head destroys the head gasket, which joins the head to the cylinders, and the engine has to be rebuilt.

**C.  Navistar Conceals the Defect**

23.  Navistar's competitors, the industry press, and other observers began to suspect that use of Advanced EGR would neither meet the 2010 EPA Standards nor lead to reliable engines.

24.  Navistar responded with numerous, repeated false public statements that its engines would meet the 2010 EPA Standards, that Advanced EGR was a "proven technology," that the Engines would be just as reliable and durable as their earlier engines, and that Trucks

equipped with Advanced EGR would have a "much higher residual value" on the used truck market than trucks equipped with SCR.

25.     At the same time Navistar was making these false public statements, Navistar and its officers were outspoken critics of SCR, calling it a "marooned technology" that would ultimately be abandoned by all manufacturers in favor of Advanced EGR.

### D.     Navistar Knew About the Defect at Least as Early as 2004

26.     Navistar knew that the EGR system was seriously flawed at least as early as 2004, when Navistar's 6.0-liter diesel engines were used in various 2004 Model Year Ford vehicles. Ford faced an unprecedented number of complaints with Navistar's 6.0-liter diesel engine, leading to Ford suing Navistar for supplying this defective engine.  These problems persisted throughout the production life of those engines.  Navistar's next diesel engine produced for Ford, the 6.4-liter engine, also had an EGR system, and also was plagued with problems throughout its production life in model years 2008 through 2010, leading Ford to begin producing its own diesel engines after Model Year 2010, rather than having them supplied by Navistar.  For Model Year 2010, Ford went to a Selective Catalytic Reduction ("SCR") system.

27.     Shockingly, despite seeing first-hand the problems with the EGR system from 2004 through 2010, and despite losing Ford as a customer for its EGR-based diesel engines, Navistar continued producing EGR-based engines and selling them to its customers, including the Maxxforce Engines at issue here.

28.     In addition, a complaint filed on October 10, 2013 against Navistar alleging securities violations[1] lists several "Confidential Witnesses," many of whom discuss problems with Navistar's EGR technology that were made known to Navistar.  For example:

a.     CW2, identified in the complaint as a former Chief Engineer for the Engine Group on several Navistar truck and engine launches, noted problems with, and expressed concerns about, the EGR technology, and presented these concerns to Navistar's then-President and CEO, Daniel Ustian.

b.     CW3, identified in the complaint as a project development team lead for Navistar in its Fort Wayne, Indiana facility, claims to have been asked to assist in developing a fall-back SCR solution in case the EGR solution was unsuccessful.  However, Navistar executives issued an order to cease and desist development of the SCR backup plan.

c.     CW5, identified in the complaint as a former Navistar Chief Engineer, allegedly told his supervisors that the EGR technology was not achievable given fuel economy and performance parameters, and the stage of EGR development at the time, and that the entire engineering community was saying that the physics of EGR weas not possible.

d.     CW8, identified in the complaint as a "Project Manager and Senior Project Manager" at Navistar from 1997 through 2007, problems with a diesel particulate filter in the EGR engines would "stop up and shut down the engine as more exhaust flowed through the engine."  This increase in

---

[1] *Construction Workers Pension Trust Fund − Lake County and Victinity v. Navistar Int'l Corp.*, Civ. No. 1:13-cv-2111, Docket Entry 66.

exhaust gas recirculation also lowered fuel economy, decreased durability, and increased cooling demands on the engine.

e.  CW12, identified in the complaint as "Navistar's Senior Vice President, North American Sales Operations," claims that Mr. Ustian told him directly not to discuss an alternate solution to the EGR technology or he would be fired.

f.  CW13, identified in the complaint as a Navistar employee from July 2008 to April 2013 and holding various Vice President and Manager roles throughout that time period, claims that "[b]y mid-2011, the EGR solution engines were experiencing significant warranty issues." Mr. Ustian and other management had access to these reports detailing the warranty issues.

g.  CW16, identified in the complaint as a Navistar employee from 2007 until 2012, claims that it became apparent in 2011 that Navistar was experiencing an increase in failure of components of the EGR engines. The increase in failures was linked to an increase in exhaust gas flowing through the engine, and the resulting soot buildup.

h.  CW18, identified as a Navistar employee since July 2001, stated that the warranty problem was initially believed to be related to the EGR valve. However, even after the EGR valve's fix, warranty issues persisted through 2012, allegedly as a result of failure of the EGR cooler.

29.     Accordingly, Navistar knew the Maxxforce Engines were defective before the first truck equipped with a Maxxforce Engine was ever sold.  Nonetheless, Navistar failed to disclose the problems with the Maxxforce Engines.

**E.     The Defect is Widespread**

30.     Complaints by owners of the Trucks demonstrate how widespread the Defect is, how the Defect manifests without warning, that Navistar is and has long been aware of the Defect, and how potentially dangerous the defective condition is:

a.     On July 1, 2009, an online user identifying himself as "an International

Tech" stated:

We have seen a scary amount of EGR coolers fail in the pretty much all MaxxForce models.  When they fail coolant is leaking into the exhaust and most of the time it is destroying both the DPF and DOC.  Big $$$!!![2]

b.     On January 29, 2011, a customer stated:

I used to drive one.  My company bought ten of them, 5 in Prostars and 5 in Transtars and we have had nothing but problems with them, to the point that the company stated they will buy no more of them only after a few months of having them.  Mine, a Transtar, has been back to the dealer for overheating issues, exhaust issues, computer issues . . .  All total, in less than 300,000 miles[3] this truck has been back to the dealer 6 times for extended stays as they try to find the problem and then fix it.  I got so sick and tired of it not being reliable that I choose to drive one of our old, 2004, Sterlings.[4]

c.     On December 24, 2011, a customer responded in the same discussion:

_____

[2] The quotes from websites below are reproduced as they appear on the internet, including any grammatical errors. This quote was found at: http://www.thetruckersreport.com/truckingindustryforum/ trucks-eighteen-wheelers/83372-maxxforce-13-a.html, accessed November 11, 2013.
[3] The longevity of commercial diesel truck engines of the kind at issue in this case cannot be compared to passenger vehicles. Average vehicle life for a commercial diesel engine is over 1 million miles without a rebuild.
[4] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines.html, accessed November 11, 2013.

Badly engineered motors...but the most common problems with them is the EGR coolers. . . I've gone through 3 of them and its a 2011 model.[5]

d.      Another responded on the same page:

So the deal with my pro star 2012 maxxforce 13 litter is this...... got it with 4500 km on it. has 24,000 on it now has been in the shop 8 times, been complaining about same issue every time. truck would stutter and fart and cough after a short time at idle...every time my dealer assure me there was no issues no codes being kicked. Went out of town got 4 hours into a 3 day haul and temp gauge spiked and said shut down blah blah blah... engine was fine temp was fine limped it into a different dealer, found an exhaust leak under cab out of egr tube, it melted 3 different sensors including the temp and egr, also melted the main wire harness that feeds all the way around engine to cab.

e.      On January 14, 2012, a customer stated:

Two out of four of the 2011 Prostars with the Maxxforce have been trouble.  However a 2009 Maxxforce 13 totally blew up with a 175,000 miles. International did replace the engine under warranty but was down for about 2 weeks.  Two of the 2011 Prostars have been plagued with check engine lights and plugged EGRs and EGR coolers.  One is on the third EGR in 85000 miles.  It also just had the engine wiring harness replaced.  A 2010 Maxxforce cracked a head and burned out an exhaust valve with in 140,000 miles.  This truck is down for 2 weeks for that repair.[6]

f.      On October 21, 2012, a customer stated:

I also just got out of the shop 2 weeks ago for an EGR valve failure.(not cooler, the actual EGR valve itself) Which I was told is another defect issue they are having . . . with the 8 times in 117000 miles I have been in the shop (for more than 1 or 2 days per repair).[7]

g.      On November 18, 2012, a customer reported his truck, at 150,000 miles

was "puffing white smoke, burning coolant, smelling like coolant."[8]

[5] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-3.html, accessed November 11, 2013.

[6] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/101922-international-prosatar-maxxforce-worthless-junk-20.html, accessed November 11, 2013.

[7] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-5.html

[8] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-5.html, accessed November 11, 2013

h.       On January 26, 2013, a customer stated:

236,000 miles, relaced turbo, egr valve , egr cooler, manifold and numerous other parts . . . 2nd prostar I've been stuck with. . . both have been problems from day one . . .we have 5 and 4 of them have all been total problems. . . computer issues, regen issues, egr issues.[9]

i.       Another online user replied on the same page:

Pretty much all 2012 MF 11/13 have to have the egr valves replaced again, due to shaft failures.  Somebody really needs to lose their job over this! I try to stand behind Int'l the best I can, but this is getting totally ridiculous now.  Every month it seems your engines have to come in for some recall or another, and no matter what is it, it takes at least a day to do it! Int'l should be ashamed of themselves!!! Trust me, I feel your pain!!! Seriously, do you know how many times I have spend all day changing an EGR valve, then 5 weeks later we have to change it again because of new recall?

j.       On March 20, 2013, an online user stated:

I work on the 13 everyday and see all the problems these engines have and I have work with the engineers from Navistar.  The base engine is a good and powerful engine but the EGR system can not handle what it was intended to handle.  The down time on these trucks is not good at all and even after repairing the EGR system two weeks later the same truck with the same problem will be back.  The repair times for repairing the EGR system on theses engines is 11.5 hrs warranty time and in real time its bout 13 hrs.  That's just the EGR system repairs haven't even mention the turbo problems.  It doesn't matter how you got your truck spec.  out you will be visiting a shop in the near future.[10]

k.       On July 21, 2013 a customer stated: "My EGR valve has been replaced 3 times and just now turned over 80,000.  No one seems to know the cause."[11]

l.       On the same page another customer replied:

well i broke down again today in rhode island.  4th time since i started here 4 months ago.  this time i was leaving my stop in providence road island

---

[9] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-6.html, accessed November 11, 2013

[10] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-7.html, accessed November 11, 2013

[11] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-8.html, accessed November 11, 2013.

jumped onto 195 west and looked back and saw smoke and coolant flying everywhere. at the same time i started to smell it and the low coolant dash warning came on. pulled it over and killed it. coolant and smoke everywhere.

31.     The Maxxforce Engine exhaust pipes between the EGR valve and exhaust

manifold leak, allowing exhaust fumes into the cab.  This was the subject of a complaint filed

with the NHSTA on 10/11/2011:

> THERE IS A STAINLESS STEEL EXHAUST FLEX PIPE UNDER THE CAB, RIGHT SIDE, JUST AFTER THE REGEN DOSER THAT IS WRAPPED IN A FLEX SHEATHING.  THE INSIDE OF THE PIPE CRACKS AND WHITE EXHAUST FLOWS OUT AND INTO THE CAB WHEN THE ENGINE GOES THRU A REGEN CYCLE.  WE HAD SEVERAL DRIVERS COMPLAIN OF THIS ISSUE, UPON INSPECTION YOU CAN NOT FIND ANY VISIBLE CRACKS IN THE EXHAUST.  SEVERAL DRIVERS WERE HAVING TO PUT THE WINDOWS DOWN IN ORDER TO ELIMINATE THE FUMES INSIDE THE CABIN WHILE DRIVING.  AFTER SENDING TO THE DEALER, THEY ADVISED THAT THE PIPE WAS CRACKED INTERNALLY BEHIND THE SHEATHING AND NEEDED TO BE REPLACED.  THEY ADVISED ON THE PROCEDURE TO CHECK FOR THIS SYMPTOM, YOU HAVE TO USE THE ENGINE SOFTWARE AND FORCE A REGEN SESSION.  ONCE YOU DO THAT, YOU CAN SEE THE WHITE FUEL SMOKE AND SMELL RAW FUEL.  THIS IS THEN DRAWN UP THRU THE HVAC DUCT AND PUTS IT INSIDE THE CABIN.  THE REPAIR IS A 500.00 PIPE PLUS LABOR FOR A TOTAL OF 800.00.  WE HAVE 2 OF 5 PROSTAR TRUCKS SO FAR THAT HAVE HAD TO HAVE THIS PIPE REPLACED, BOTH DRIVERS WITH SAME COMPLAINT.

32.     Complaints of exhaust leaks into the cab were very common on the internet as

well:

> a.      On March 14, 2012, an International Prostar owner complained:

> While in our PA shop 2 months ago, I heard 4 drivers come on and report of exhaust smell in the cab.  Turns out all 4 had exhaust leaks at the exhaust side of 1 of the turbos, and since International's engineers didn't see fit to put a fresh/recirc switch on the HVAC(only recirculates on max a/c) they were sucking exhaust right in since the fresh air vent and exhaust are on the same side.  We even had 1 driver get carbon monoxide poisoning not once but twice (once from

his new truck, once from a faulty dealership repair). The doctors said he was very close to having high enough levels to cause permanent brain damage.[12]

b.　　　On April 19, 2012, another online user responded:

This is a common issue. They had a bad batch of EGR inlet pipes. I would suggest that anyone that has a 2010/2011 build truck periodically check by the EGR cooler for soot (dead giveaway) and get the truck in for replacements. Other symptoms are low power and check engine lights for melted harnesses.

c.　　　In October 2013, an International Prostar owner complained:

I have been getting raw exaust fumes in my cab when driving. Also when I am sitting idle. This truck has been to a dealer for this problem, but the problem still exists. From time to time when I am driving there is a rush of fumes into the cab[13].

d.　　　Another online user responded on the same page:

My 13 prostar did that too. It was the exhaust manifold gasket between number 5 and 6 cylinder. It happened now twice on me and the exhaust tube under passenger side door cracked. Had the bellows tube brake once and it melted the wiring harness.

e.　　　On March 6, 2012, a customer complained:

Went out of town got 4 hours into a 3 day haul and temp gauge spiked and said shut down blah blah blah.... engine was fine temp was fine limped it into a different dealer, found an exhaust leak under cab out of egr tube, it melted 3 different sensors including the temp and egr, also melted the main wire harness that feeds all the way around engine to cab.[14]

f.　　　On April 5, 2012, a customer complained:

About a month and a half ago I found out that the Truck that I use at work had an exhaust leak and fumes were getting into the cab. The truck was taken out of service and fixed. It was in the shop for 4 weeks. After it was fixed I used the truck for another 3 weeks and guess what? The same thing happened except it was

---

[12] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-4.html, accessed November 11, 2013.

[13] http://www.thetruckersreport.com/truckingindustryforum/international-forum/229031-2013-international-pro-star-exaust-fumes.html, accessed November 11, 2013.

[14] http://www.thetruckersreport.com/truckingindustryforum/trucks-eighteen-wheelers/126451-maxx-force-13-engines-3.html, accessed November 11, 2013.

much worst. I woke up one night gagging and choking on exhaust fumes. The truck is a 2012 INTERNATIONAL PRO-STAR plus. It is not even a year old.[15]

g.      On March 12, 2013 a Prostar driver complained:

I drive a 2010 International Prostar for Swift, Truck # 309719, this truck leaks exhaust fumes into the cab an all around the truck during the Regen procedure, I'm pretty sure this isn't safe to be around while the truck is in Regen! I have told Swift mechanics numerous times about this issue, but yet this still occurs! I believe I have developed breathing issues an[d] pains in the upper parts of my chest! Very concerned![16]

33.     While paying hundreds of millions of dollars in warranty claims to replace defective parts with equally defective parts on its Maxxforce EGR Engines, Navistar continued to tout its EGR technology as the future of emissions technology and omitted to disclose that the Defect was not fixable. Navistar blamed the Defect and warranty claims on manufacturing problems (which it claimed to have resolved), and continued to portray the Engines as reliable.

34.     Moreover, these were the same problems experienced with Navistar EGR-based diesel engines since 2004, and Navistar knew they would continue as long as Navistar stayed with the EGR system.

35.     On information and belief, Plaintiff alleges that Navistar failed to disclose to customers that coolant consumption caused by the Defect was outside the normal range.

36.     Commercial trucks are not earning money for their owners if they are sitting in the shop for repairs. Navistar customers who bought Trucks equipped with the Maxxforce Engines in reliance on Navistar's failures to disclose that the Maxxforce Engines were defective and unreliable were financially devastated by the Maxxforce Engines' repeated failures.

---

[15] http://www.operation18.com/forum/topics/exhaust-fumes, accessed November 11, 2013.
[16] http://car-and-safety.com/international-prostar-safety/international-prostar-2010.htm, accessed November 11, 2013.

37.     In July 2012, Navistar finally announced that it was abandoning Advanced EGR and adopting for the 2013 model year the same SCR technologies that its competitors had been using.

38.     Even after announcing its switch to SCR technology, Navistar continued to sell the Engines and omitted to disclose to buyers that resale market demand for vehicles equipped with those Engines would be weak.

39.     In August 2012, discussing Navistar's announcement that beginning in March 2013 Navistar would equip its International Trucks with SCR and abandon Advanced EGR, the COMMERCIAL CARRIER JOURNAL quoted Jack Allen, North American Truck Group president for Navistar downplaying any problems with the Advanced EGR engine Trucks:

> Customers should not be hesitant to purchase an EGR-only MaxxForce-equipped truck between now and March, Allen said. And likewise, he predicted concerns over the resale value of EGR-only MaxxForce-equipped trucks will prove to be temporary.
>
> "The judge didn't void the trucks," he said of [an appellate court ruling involving whether the EPA followed proper procedures in implementing a certain policy].[17] "Check out the Website about trucks sold under interim rule. Nothing will happen. And as for used truck values? We feel the secondary market will be very receptive to a truck built without SCR. Our MaxxForce fuel economy is great. Our performance is great. And we have more than 50,000 of those engines out there."[18]

40.     The trucking industry is now well aware of the problems with the Engines. Not only were the Trucks equipped with these Engines worth far less at the time of purchase than they would have been with an engine free from defects, the Trucks have a significantly diminished value on the resale market compared with competitors' trucks with similar mileage and are very difficult to sell. Customers who bought the Trucks with Maxxforce Engines are

---

[17] *Daimler Trucks N. Am. LLC v. EPA*, 737 F.3d 95 (D.C. Cir. 2013).
[18] http://www.ccjdigital.com/navistar-devises-plan-to-counter-losing-egr-gamble/, accessed November 11, 2013.

now stuck with an unfixable Defect, dwindling or expired warranties, and a greatly diminished market for resale or trade-in of the used Trucks.

41.     The powertrain and emissions systems in the Engines are covered by a standard 5 year or 100,000 mile warranty, whichever comes first.  Navistar's warranty provides:

> All emission control system parts proven defective during normal use will be repaired or replaced during the warranty period.  Warranty repairs and service will be done by any authorized International dealer with no charge for parts, labor, and diagnostics.

42.     When owners and lessees, including Plaintiffs, presented the Trucks to Navistar for repair within the warranty period, Navistar failed to properly repair the emissions system and/or replaced it with another equally defective and failure-prone system, never properly remedying the Defect.

## PLAINTIFF-SPECIFIC FACTS

### A.     Denis Gray Trucking

43.     Plaintiff Denis Gray Trucking, Inc. was founded in 1977 and has been in continuous operation since.  Navistar International Trucks have always been Denis Gray Trucking's preference, and it estimates it has purchased close to 100 trucks from Navistar International over the years.  Denis Gray Trucking has purchased trucks exclusively from the same Navistar International Dealer, Peterson Trucks, Inc. in San Leandro, California, for the last 20 years.

44.     Between November 2010 and August 2012, Denis Gray Trucking bought a total of 6 used Navistar International Prostar trucks with Maxxforce 13 Advanced EGR Engines, Model Years ("MY") 2010 – 2012, with factory warranty directly from Navistar International, identified as:

> Truck 66 (MY 2010, VIN # 3HSCTSJR8AN282062);

Truck 67 (MY 2010, VIN # 3HSCTSJRXAN282063);

Truck 69 (MY 2011, VIN # 3HSDJSJR6BN347597);

Truck 71 (MY 2011, VIN # 3HSDJSJR9BN375085);

Truck 72 (MY 2011, VIN # 3HSDJSJR3BN375096); and

Truck 73 (MY 2012, VIN # 3HSDJSJR6BN366828).

45.     Denis Gray Trucking typically owns trucks for 8 years, paying off the loans well before the end of the useful life of the trucks.

46.     Denis Gray Trucking still owns Trucks 69 and 73.  Both had their EGR coolers replaced by Navistar under warranty.

47.     Denis Gray Trucking bought Trucks 66 and 67 in November 2010.  Both had consistent failures of EGR-related components.  Truck 66 had two failures of EGR-related components that Navistar replaced under warranty while Denis Gray Trucking owned it.  Prior to Denis Gray Trucking's ownership, Truck 67's EGR cooler failed and was replaced under warranty at 58,575 miles.  These replacements did not repair the Defect, which remained in the Engines after the replacements were done.

48.     Denis Gray Trucking bought Truck 69 in November 2011.

49.     In June 2012, Denis Gray Trucking complained to Navistar about the repeated failures of Truck 66, and traded it in when he purchased Trucks 71 and 72.  Navistar failed to tell Denis Gray Trucking that Trucks 71 and 72 would have the same reliability problems and that Navistar had not remedied the problems with earlier Advanced EGR systems.

50.     Trucks 71 and 72 also had repeated EGR failures.  Truck 71's EGR cooler failed at 113,000 miles (which was covered under the terms of an extended warranty) and a second time at 154,000 miles (which was not).  Truck 72 had EGR-related attempted repairs at 111,000

miles. Prior to Denis Gray Trucking's ownership, Truck 72's EGR cooler failed and was replaced under warranty at just 6,590 miles.

51.     In August 2012, one of Denis Gray Trucking's non-Maxxforce trucks was ready to be retired. Due to the huge problems with its Maxxforce-equipped Prostars, for the first time Denis Gray Trucking considered other brands. Ultimately, due to its long relationship with Navistar, and in reliance on Navistar's assurances about improved reliability, it purchased Truck 73. Until mid-2013, the Maxxforce 13 Advanced EGR Engine was the only one that Navistar offered to buyers of heavy-duty, Class 8 trucks like those Denis Gray Trucking used.

52.     Fed up with the poor reliability of the Advanced EGR Engines, Denis Gray Trucking traded in defective Trucks 67, 71, and 72 in May 2013 in exchange for 2013 Navistar International Prostars with Cummins SCR engines.

53.     Denis Gray Trucking experienced numerous breakdowns with its 6 Prostar vehicles, most related to the emissions system. Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect.

54.     Denis Gray Trucking experienced long wait times to have its Engines repaired. Only Navistar technicians could work on the Engines' defective emissions systems. There were not enough technicians to repair the Defect, and a shortage of emissions systems parts to repair the Defect.

55.     Denis Gray Trucking has suffered ascertainable losses as a result of Navistar's misrepresentations and omissions associated with the Defect, including but not limited to substantial loss of revenue due to inoperable trucks waiting to be repaired, out of pocket costs to fix failures and attempted repairs to the Engines, and substantially lower trade in and resale

values associated with the vehicles equipped with the Engines because the problems with the

Engines are widely known and feared in the industry.

56.     Denis Gray Trucking has a long relationship with Navistar and had repeated

contact with its dealers and representatives between 2010 and 2012.

57.     However, neither Navistar nor any of its dealers or representatives informed

Denis Gray Trucking of Navistar's misrepresentations and omissions associated with the Defect.

To the contrary, Navistar's representatives told Denis Gray Trucking that the 2011 and 2012

Engines did not have the Defect.

58.     Had Denis Gray Trucking been told of the Defect, it would not have purchased

the Trucks or it would have paid less for them.

59.     Denis Gray Trucking's experiences mirror that of thousands of other owners and

lessees of Trucks with the defective Engines.

### B.     Carmichael NationaLease

60.     Plaintiff Carmichael is a family owned business headquartered in Chicago,

Illinois.  It was founded in 1972 and has been in continuous operation ever since.

61.     Plaintiff Carmichael is a full service and full maintenance truck leasing company,

open 24 hours a day, 7 days a week, 365 days a year and employing 30 mechanics.

62.     Plaintiff Carmichael is a member/affiliate of NationaLease, which is a network of

other privately held leasing companies with a combined 700 locations.

63.     As of July 2, 2014, Plaintiff Carmichael has 381 trucks and 225 trailers.

64.     Plaintiff Carmichael's customer base consists mainly of local small and family-

owned businesses.  It has a strong foothold in providing refrigerated trucks.

65.     Included in the lease of Plaintiff Carmichael's vehicles is the purchase of the

vehicle to customer specifications; title, licensing, and registration; all scheduled maintenance

and repairs; all wear and tear issues; emergency road service; and replacement trucks when customer's leased truck is in for service.

66.     As a result, Plaintiff Carmichael's business depends heavily on the reliability and road-readiness of the vehicles it leases to customers.

67.     Plaintiff Carmichael has a long-standing relationship with Navistar.  Up until 2003, Plaintiff Carmichael purchased almost exclusively Navistar vehicles.

68.     Plaintiff Carmichael currently owns 31 Navistar vehicles, model years 2011, 2012, and 2013, with the defective MaxxForce engine: 12 Model 4300 Refrigerated Box Trucks, and 19 Model 8600 Tandem Day Cab Tractors.  These vehicles are identified as:

Truck 2055 (MY 2011, VIN # 1HTJTSKN5BH331213);

Truck 2056 (MY 2011, VIN # 1HTJYSKN7BH331214);

Truck 2057 (MY 2011, VIN # 1HTJTSKN9BH331215);

Truck 2060 (MY 2011, VIN # 1HSHXSJR3BJ339282);

Truck 2061 (MY 2011, VIN # 1HSHXSJR5BJ339283);

Truck 2062 (MY 2011, VIN # 1HSHXSJR9BJ339285);

Truck 2064 (MY 2011, VIN # 1HSHXSJR3BJ391138);

Truck 2065 (MY 2011, VIN # 1HSHXSJR5BJ391139);

Truck 2066 (MY 2011, VIN # 1HSHXSJR1BJ391140);

Truck 2067 (MY 2011, VIN # 1HSHXSJR3BJ391141);

Truck 2069 (MY 2012, VIN # 1HSHXSJR9CJ401236);

Truck 2070 (MY 2012, VIN # 1HSHXSJRXCH401253);

Truck 2071 (MY 2012, VIN # 1HSHXSJR4CJ401256);

Truck 2072 (MY 2012, VIN # 1HSHXSJR8CJ401261);

Truck 2073 (MY 2012, VIN # 1HSHXSJRXCJ401262);

Truck 2074 (MY 2012, VIN # 1HSHXSJR1CJ401263);

Truck 2075 (MY 2012, VIN # 3HAJTSKN6CL627658);

Truck 2076 (MY 2012, VIN # 3HAJTSKN8CL627659);

Truck 2077 (MY 2012, VIN # 3HAJTSKN4CL627660);

Truck 2078 (MY 2012, VIN # 3HAJTSKN6CL627661);

Truck 2079 (MY 2012, VIN # 3HAJTSKN8CL627662);

Truck 2080 (MY 2012, VIN # 1HTJTSKL5CH051016);

Truck 2081 (MY 2012, VIN # 1HSHXSJRXBJ401292);

Truck 2082 (MY 2012, VIN # 1HSHXSJR4CJ401290);

Truck 2083 (MY 2012, VIN # 1HSHXSJRXCJ401293);

Truck 2084 (MY 2012, VIN # 1HSHXSJR1CJ401294);

Truck 2085 (MY 2012, VIN # 1HSHXSJR6CH124553);

Truck 2086 (MY 2012, VIN # 1HSHXSJR1CH124556);

Truck 2087 (MY 2013, VIN # 1HTMMAAN6DH309679);

Truck 2088 (MY 2013, VIN # 1HTMMAAN2DH309680);

Truck 2089 (MY 2013, VIN # 1HTMMAAN4DH309681).

69. These vehicles were purchased new from Chicago International Truck in Chicago, Illinois for between $78,529.12 and $89,851.03 each.

70. Plaintiff Carmichael typically owns its trucks for 8 years before needing to replace them.

71. Plaintiff Carmichael has experienced numerous breakdowns with its Navistar vehicles, most related to the emissions system. Despite bringing the vehicles to Navistar authorized repair facilities within the express warranty period for repair, the Engines continued to experience the same Defect, often within six months.

72.     Neither Navistar nor any of its dealers or representatives informed Carmichael of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told Carmichael that the 2011 and 2012 Engines did not have the Defect.

73.     Had Carmichael been told of the Defect, it would not have purchased the Trucks or it would have paid less for them.

74.     As a result of Navistar's misrepresentations and omissions associated with the Defect, Carmichael has suffered ascertainable losses, including but not limited to substantial loss of revenue due to inoperable trucks waiting to be repaired, out of pocket costs to fix failures and attempted repairs to the Engines, providing replacement trucks to those customers whose leased trucks broke down, and substantially lower trade in and resale values associated with the vehicles equipped with the Engines because the problems with the Engines are widely known and feared in the industry.

75.     Carmichael's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

### C.     GTL Enterprises Inc.

76.     Plaintiff GTL Enterprises Inc. ("GTL") is a family owned container hauling company in Othello, Washington.  It was founded in 1952 and has been in continuous operation since.

77.     GTL has purchased and currently owns 14 Navistar International Trucks.  These vehicles were purchased for $135,000 from Husky International in Spokane, Washington, and they were purchased with the extended warranty.  These vehicles are identified as:

    Truck 235 (MY 2013, VIN # 3HSDJSJR9DN326083);

    Truck 236 (MY 2013, VIN # 3HSDJSJR0DN326084);

Truck 237 (MY 2013, VIN # 3HSDJSJRXDN326089);

Truck 238 (MY 2013, VIN # 3HSDJSJRXDN326092);

Truck 239 (MY 2013, VIN # 3HSDJSJR2DN326085);

Truck 240 (MY 2013, VIN # 3HSDJSJR6DN326090);

Truck 241 (MY 2013, VIN # 3HSDJSJR3DN326080);

Truck 242 (MY 2013, VIN # 3HSDJSJR5DN326081);

Truck 243 (MY 2013, VIN # 3HSDJSJR4DN326086);

Truck 244 (MY 2013, VIN # 3HSDJSJR6DN326087);

Truck 245 (MY 2013, VIN # 3HSDJSJR8DN326088);

Truck 246 (MY 2013, VIN # 3HSDJSJR7DN326082);

Truck 247 (MY 2013, VIN # 3HSDJSJR8DN326091);

Truck 248 (MY 2014, VIN # 3HSDJSJR1EN755915).

78.    Prior to purchasing the above, GTL had never bought new equipment, instead choosing to purchase equipment 4-5 years old and running it for another 4-5 years before circulating it out.

79.    When GTL purchased the above vehicles, it traded in all of its old, paid-for equipment. As a result, GTL heavily relies upon its Navistar vehicles, and the repeated failures of those vehicles have put the company in jeopardy.

80.    All of GTL's Navistar vehicles have suffered numerous problems and failures related to the defective Maxxforce Engines, leading to the trucks constantly being in the shop. These are the same problems suffered by the other named Plaintiffs and Class members: cooler failures and other engine failures and issues related to the faulty EGR technology.

81.    GTL has experienced numerous breakdowns with its Navistar vehicles, most related to the emissions system. Despite bringing the vehicles to Navistar authorized repair

facilities within the express warranty period for repair, the Engines continued to experience the same Defect.

82.     GTL estimates that it has lost over 150 days' worth of revenue due to the failures of these vehicles.

83.     GTL was aware of problems with Navistar's 2008 vehicles, but did not know that its 2013 and 2014 model year vehicles also suffered from serious problems.

84.     Had GTL been told of the Defect, it would not have purchased the Trucks or it would have paid less for them.

85.     Neither Navistar nor any of its dealers or representatives informed GTL of Navistar's misrepresentations and omissions associated with the Defect.  To the contrary, Navistar's representatives told GTL that the 2011 and 2012 Engines did not have the Defect.

86.     As a result of Navistar's misrepresentations and omissions associated with the Defect, GTL has suffered ascertainable losses, including but not limited to substantial loss of revenue due to inoperable trucks waiting to be repaired, out of pocket costs to fix failures and attempted repairs to the Engines, providing replacement trucks to those customers whose leased trucks broke down, and substantially lower trade in and resale values associated with the vehicles equipped with the Engines because the problems with the Engines are widely known and feared in the industry.

87.     GTL's experiences mirror that of thousands of other owners and lessees of Trucks with the defective Engines.

## TOLLING

88.     Because the defects in the Engines are not detectable until the manifestation of the damage, Plaintiffs and Class members were not reasonably able to discover the problem until after the Engines failed, despite due diligence.  More importantly, Navistar not only failed to

disclose the Engines' defects but also failed to warn Plaintiffs and Class members of them. Navistar took steps to actively conceal the inherently defective Engines from the Class.

89.     As a result, any and all applicable statutes of limitation have been tolled by Navistar's concealment of the true facts alleged herein, and Navistar is equitably estopped from relying upon any statutes of limitation because of its concealment of the defective nature of them.

## CLASS ACTION ALLEGATIONS

90.     The named Plaintiffs bring this action as a Class Action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority provisions.

91.     The Classes are defined follows:

a.     **Nationwide Class**

Plaintiffs and all similarly-situated persons and entities residing in the United States who purchased, not for resale, or leased a 2008-2013 model year Navistar International Corporation vehicles equipped with Maxxforce Advanced EGR diesel engines in the United States.

Excluded from the Class are Navistar, its agents, affiliates, and employees, the Judge assigned to this matter, and any member of the Judge's staff and immediate family.

b.     **California Class**

Plaintiff Denis Gray and all similarly-situated persons and entities residing in the United States who purchased, not for resale, or leased a 2008-2013 model year Navistar International Corporation vehicles equipped with Maxxforce Advanced EGR diesel engines in the State of California.

Excluded from the Class are Navistar, its agents, affiliates, and employees, the Judge assigned to this matter, and any member of the Judge's staff and immediate family.

c.      **Washington Class**

> Plaintiff GTL and all similarly-situated persons and entities
> residing in the United States who purchased, not for resale, or
> leased a 2008-2013 model year Navistar International Corporation
> vehicles equipped with Maxxforce Advanced EGR diesel engines
> in the State of Washington.

Excluded from the Class are Navistar, its agents, affiliates, and employees, the Judge

assigned to this matter, and any member of the Judge's staff and immediate family.

d.      **Illinois Class**

> Plaintiff Carmichael and all similarly-situated persons and entities
> residing in the United States who purchased, not for resale, or
> leased a 2008-2013 model year Navistar International Corporation
> vehicles equipped with Maxxforce Advanced EGR diesel engines
> in the State of Illinois.

Excluded from the Class are Navistar, its agents, affiliates, and employees, the Judge

assigned to this matter, and any member of the Judge's staff and immediate family.

92.     Claims for personal injury are specifically excluded from the Class definitions.

93.     *Numerosity.*  The requirements of Rule 23(a)(1) are satisfied in that there are too

many Class members for joinder of all of them to be practicable.  On information and belief, this

Class includes over one thousand members.  This Class, as defined above, meets the numerosity

requirement.

94.     *Commonality.*  The claims of the Class members raise numerous common issues

of fact and/or law, thereby satisfying the requirements of Rule 23(a)(2).  These common legal

and factual questions—the answers to which will drive resolution of the litigation—may be

determined without the necessity of resolving individualized factual disputes concerning any

Class Member, including, but not limited to, the following questions:

*Questions of Fact*

(i)      Whether the Maxxforce Advanced EGR Engines are defectively designed and/or manufactured such that they are not suitable for their intended use.

(ii)     Whether the Maxxforce Advanced EGR Engines suddenly and dangerously fail.

(iii)    Whether the Maxxforce Advanced EGR Engines are substantially likely to fail before their intended useful life as a result of their defective design and/or manufacture.

(iv)    Whether Navistar knew or should have known of the inherent design and/or manufacturing defect of the Maxxforce Advanced EGR Engines.

(v)     Whether Navistar fraudulently concealed from and/or failed to disclose to Plaintiffs and Class members that Maxxforce Advanced EGR Engines were inherently defective and dangerous and prone to fail prematurely.

(vi)    Whether Navistar failed to adequately warn Plaintiffs and Class members of the inherent defects and dangers posed by the Maxxforce Advanced EGR Engines.

(vii)   Whether Navistar's dealerships were unable to properly repair the Defect, such that Navistar failed to honor its warranty obligation to properly repair the Engine during the warranty period.

(viii)  Whether Plaintiffs and Class members were in fact injured by purchasing a vehicle that contains an engine which does not meet the quality standard represented by Navistar.

*Questions of Law*

(i)      Whether Navistar's conduct in manufacturing, marketing and selling the Maxxforce Engines constitutes a violation of the California Unfair Competition Law, Business and Professions Code §§ 17200 *et seq.*; the Washington Consumer Protection Act, RCW

19.86.020 *et seq.*; and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq.*

(ii)     Whether Navistar's conduct in selling Engines it knew to be defective, and its conduct in failing to inform purchasers of vehicles equipped with these Engines of the defect, constitutes a violation of the Washington Consumer Protection Act, RCW 19.86.020 *et seq.*; and the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1 *et seq.*

(iii)     Whether Navistar engaged in unfair or deceptive acts or practices when it concealed the inherent defective conditions and dangers of the Maxxforce Engines and failed to warn Plaintiffs and the Class members of same.

(iv)     Whether Navistar breached express and implied warranties.

95.     *Typicality.*  The claims of the named Plaintiffs are typical of the unnamed Class members because they have a common factual source and rest upon the same legal and remedial theories, thereby satisfying the requirements of Rule 23(a)(3).  For example, the named Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all Class members were injured or damaged by the same wrongful practices in which Navistar engaged, namely the manufacture and sale of the inherently defective and dangerous Maxxforce Advanced EGR Engines, the intentional concealment of those defects, and Navistar's inability to repair the Defect.

96.     *Adequacy of Representation.*  The requirements of Rule 23(a)(4) are satisfied in that each named Plaintiff has a sufficient stake in the litigation to prosecute its claims vigorously on behalf of the Class members, and each named Plaintiff's interests are aligned with those of the proposed Class.  There are no defenses of a unique nature that may be asserted against any

Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. No Plaintiff has any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and no Plaintiff has any conflict with any other member of the Class. Plaintiffs have retained competent counsel experienced in class action litigation, including product defect and, specifically, vehicle defect, class actions, to represent them and the Class members in this litigation.

97.     *Predominance.* The Rule 23(b)(3) predominance requirement is satisfied because the common factual and legal issues identified above are sufficiently cohesive to warrant adjudication by representation. In particular, Plaintiffs, like all Class members, have suffered a common cause of injury, namely the defective Engines in the Class members' Vehicles. Plaintiffs, like all Class members, assert the same legal claims and seek the same forms of relief. Those common issues predominate over any individual issues.

98.     *Superiority*. Class action treatment is also superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable. The expense of individual Class members prosecuting separate claims is large, and even if every Class Member could afford individual litigation, the court system would be unduly burdened by individual litigation in such cases. Individual litigation would also present the potential for varying, inconsistent or contradictory judgments while magnifying the delay and expense to all parties and to the court system, thus resulting in multiple trials of the same legal issue and creating the possibility of repetitious litigation. As a result, it is desirable to concentrate litigation in this forum. Plaintiff knows of no difficulty to be encountered in the management of this action that

would preclude its maintenance as a class action.  Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class is proper.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF EXPRESS WARRANTY
### (On Behalf of Plaintiffs and the Nationwide Class)

99.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

100.     Navistar warrants the powertrain and emissions systems in the Engines to purchasers and lessees with a standard 5 year or 100,000 mile warranty, whichever comes first. The warranty provides:

> All emission control system parts proven defective during normal use will be repaired or replaced during the warranty period.  Warranty repairs and service will be done by any authorized International dealer with no charge for parts, labor, and diagnostics.

(*See, e.g.*, Exhibit A, Engine Operation and Maintenance Manual, at 7.)

101.     As an express warrantor and manufacturer and merchant, Navistar had obligations to conform the Engines to its express warranties.

102.     The Defect at issue in this litigation was present at the time of sale and lease to Plaintiffs and Class members.

103.     Navistar breached its express warranties (and continues to breach those express warranties) because it did not (and does not) properly repair the defective Engines in Plaintiffs' and Class members' Trucks.  Navistar further breached these express warranties because it replaced the defective Engines with the same defective Advanced EGR system during purported repairs.

104. Pursuant to the express warranties, Navistar was obligated to pay for or reimburse Plaintiffs and th Class members for costs incurred in replacing the defective Engines.

105. Pursuant to the express warranties, Navistar also was obligated to properly repair the Defect.

106. Navistar and its authorized dealers have failed and refused to conform the Engines to the express warranties and Navistar's conduct, as discussed throughout this Complaint, voided the limitations on liability contained in its warranty.

107. Plaintiffs used the Engines in a manner consistent with their intended use and have performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct described throughout this Complaint.

108. Navistar had actual knowledge of, and/or received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such knowledge and notice, failed and refused to offer an effective remedy.

109. In addition, Navistar has received, on information and belief, thousands of complaints and other notices from customers advising them of the Defect at issue in this litigation.

110. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Navistar to limit its express warranties in a manner that would exclude or limit coverage for the defective Engines that were present as of the time of sale or lease, which Navistar knew about prior to offering the Engines for sale, which Navistar concealed and did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the Defect at issue is null and void.

111.     Accordingly, Plaintiffs and Class members suffered damages caused by Navistar's breach of the express warranties and are entitled to recover damages as set forth herein.

## COUNT II
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of Plaintiffs and the Nationwide Class)

112.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

113.     Navistar is and was at all relevant times a merchant with respect to the Engines. At all times relevant hereto, applicable law imposed a duty that requires that the Engines be fit for the ordinary purposes for which Engines are used and that they be pass without objection in trade for their description.

114.     Navistar has not validly disclaimed, excluded, or modified the implied warranties or duties described above, and any attempted disclaimer or exclusion of the implied warranties was and is ineffectual.

115.     The Engines were defective at the time they left the possession of Navistar, as set forth above.  Navistar knew of this Defect at the time these transactions occurred.  Thus, the Engines, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.  By virtue of the conduct described herein and throughout this Complaint, Navistar breached the implied warranty of merchantability.

116.     Plaintiffs have used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Navistar or by operation of law in light of Navistar's unconscionable conduct.

117.    Navistar had actual knowledge of, and received timely notice regarding, the Defect at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

118.    In addition, Navistar has received, on information and belief, thousands of complaints and other notices from customers advising of the Defect associated with the Engines.

119.    Plaintiffs have had sufficient direct dealings with anNavistd/ar or its authorized dealers to establish any required privity of contract.  Notwithstanding this, privity is not required in this case because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Navistar and its dealers; specifically, they are intended beneficiaries of Navistar's express warranties.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  The warranty agreements were designed for and intended to benefit the ultimate purchasers and lessees only.

120.    As a direct and proximate result of Navistar's breach of warranties, Plaintiffs and Class members suffered economic damage, including loss attributable to the diminished value of their Engines, loss of use, as well as the monies spent and to be spent to repair and/or replace their Engines.

### COUNT III
### BREACH OF IMPLIED COVENANT OF GOOD
### FAITH AND FAIR DEALING
### (On Behalf of Plaintiffs and the Nationwide Class)

121.    Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

122.     Plaintiffs and Class members entered into agreements to purchase Engines with Navistar, or otherwise were in contractual privity with Navistar as a result of the express warranties described herein.

123.     The contracts and warranties were subject to the implied covenant that Navistar would conduct business with Plaintiffs and Class members in good faith and would deal fairly with them.

124.     Navistar breached those implied covenants by failing to disclose that any repair or replacement of defective parts in Plaintiffs' and Class members' Engines, would not cure the defect.

125.     As a direct and proximate result of Navistar's breach of its implied covenants, Plaintiffs and Class members have been damaged in an amount to be determined at trial.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Nationwide Class)**

126.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

127.     Navistar manufactured, distributed, and sold to Class members the Engines that they knew contained an inherently dangerous or defective condition.

128.     Navistar continued to manufacture, distribute, and sell to Class members the Engines after receiving substantial complaints of systematic product failure due to the dangerous or defective condition.

129.     Navistar did not disclose this dangerous or defective condition to consumers, and the condition was not easily discoverable by consumers.

130.     Navistar omitted this information to induce Plaintiffs and Class members to enter into a business transaction: the purchase of its vehicles containing the Engines.

131.     Plaintiffs and Class members justifiably relied on Navistar's omission in that they paid more for the Engines than the Engines would have been worth had Navistar disclosed the defective condition, or they would have purchased different vehicles altogether.

132.     Plaintiffs and Class members were harmed by Navistar's misrepresentations regarding the dangerous and defective condition of the Engines and are entitled to damages as a result in an amount to be proven at trial.

### COUNT V
### FRAUDULENT CONCEALMENT
### (On Behalf of Plaintiffs and the Nationwide Class)

133.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

134.     Navistar omitted an existing fact about the Engines when it failed to disclose information regarding the Engines' dangerous and defective condition.

135.     The omission is material because the defective condition poses a serious safety issue to Engines owners and to the public.

136.     The omission rendered Navistar's representations regarding the Engines false because the Engines were in fact defective.

137.     Navistar manufactured, distributed, and sold the Engines despite having knowledge of their defective and dangerous condition.

138.     Navistar intended that purchasers and lessees would rely on its omissions regarding safety, reliability, and resale value of the Engines to bolster sales.

139.     Plaintiffs and Class members were not aware of the defective condition and could not reasonably have discovered the defective condition.

140.     Plaintiffs relied on Navistar's omission in that they paid more for the Engines than the Engines would have been worth had Navistar disclosed the defective condition, or they would have purchased different vehicles altogether.

141.     Plaintiffs had the right to rely on Navistar's omissions that created the false impression that the Engines were safe and reliable based on reasonable consumer expectations that the Engines would not be designed such that they fail under normal conditions of use or would be substantially certain to fail before the end of their useful life.

142.     Navistar had an affirmative duty to disclose the defective condition of the Engines to consumers because they were in a superior position to know the true state of the defective Engines.  Navistar knew of the defective and dangerous condition and the condition was not easily discoverable by consumers.  Navistar breached its duty by failing to disclose the condition.

143.     Navistar fraudulently concealed the defective condition of the Engines, causing damages to Plaintiff in the form of replacement and other costs.

### COUNT VI
### UNJUST ENRICHMENT
#### (On Behalf of Plaintiffs and the Nationwide Class)

144.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

145.     Navistar has been unjustly enriched by the sale of vehicles containing the defective Maxxforce Engines to Plaintiffs and the Class members.

146.     Plaintiffs and the Class members conferred a benefit on Navistar, but Navistar failed to disclose its knowledge that Plaintiffs did not receive what they paid for and misled Plaintiffs and Class members regarding the qualities of the Maxxforce Engines, and the vehicles containing these Engines, while profiting from this deception.

147.    It would be inequitable, unconscionable, and unjust to permit Navistar to retain the benefit of these profits that it unfairly obtained from Plaintiffs and the Class members.

148.    Plaintiffs and the Class members, having been injured by Navistar's conduct, are entitled to restitution or disgorgement of profits as a result of the unjust enrichment of Navistar to the detriment of Plaintiffs and Class members.

**COUNT VII**
**VIOLATIONS OF ILLINOIS CONSUMER FRAUD**
**AND DECEPTIVE PRACTICES ACT, 815 ILCS 505/1 *ET SEQ*.**
**(On Behalf of Plaintiff Carmichael and the Illinois Class)**

149.    Plaintiff Carmichael incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

150.    The Illinois Consumer Fraud and Deceptive Trade Practices Act ("ICFA") prohibits "unfair and deceptive practices."

151.    Plaintiff Carmichael and Illinois Class members are consumers as defined in 815 ILCS 505/1(e).

152.    Plaintiff Carmichael and the Illinois Class reasonably expected that their Navistar vehicles would not have defective Engines that caused their vehicles to repeatedly and inevitably fail, leading to, among other things, their inability to use the vehicles for their intended purpose, lost revenue, deflated resale value, repair costs, and towing costs to Plaintiffs and Class members.

153.    Navistar's misconduct, including the omissions of material facts, took place in the course of trade or commerce in Illinois, and arose out of transactions that occurred in Illinois.

154.    Navistar had knowledge of the defective Engines at all relevant times herein.

155.    Despite this knowledge, Navistar has failed to disclose the existence of this material information to Plaintiff Carmichael and the Illinois Class at the time each of them

purchased the vehicles containing the defective Engines, and/or at the time they made warranty claims related to the defective Engines.

156.     Navistar intended, and continues to intend, that Plaintiff Carmichael and the Illinois Class members rely on the omissions of material facts.

157.     In so doing the above, Navistar has engaged in an unfair or deceptive act prohibited by the ICFA.

158.     If not for Navistar's deceptive and unfair acts of concealing from Plaintiff Carmichael and Illinois Class members the material facts as alleged herein, they would not have purchased the Navistar vehicles, or would have paid significantly less for them.

159.     Navistar, at all relevant times, knew or should have known that Plaintiff Carmichael and Illinois Class members did not know and could not have reasonably discovered the defective Engines prior to their purchases.

160.     As a direct and proximate result of Navistar's violations of the ICFA, Plaintiff Carmichael and the Illinois Class members suffered damages in the form of, among other things, lost revenue, lost revenue, deflated resale value, repair costs, towing costs, and other expenses.

161.     Navistar's violation of the ICFA entitles Plaintiff Carmichael and the Illinois Class to statutory and actual damages, punitive damages, injunctive relief, and attorney's fees and costs.

## COUNT VIII
## VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW,
### BUS. & PROF. CODE §§ 17200 *ET SEQ.*
### (On Behalf of Plaintiff Denis Gray Trucking and the California Class)

162.     Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth herein.

163.     Plaintiff Denis Gray and California Class members are natural persons and legal entities and, as such, constitute "persons" as defined by Bus. & Prof. Code § 17201.

164.     By its plain terms, Bus. & Prof. Code § 17200 provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

165.     Navistar engaged in unfair, unlawful, and fraudulent business practices when it: (i) manufactured, distributed and sold to the Class the Engines that it knew or should have known contained an inherently defective and dangerous condition that caused the Engines to fail, suddenly and dangerously, within their useful life; (ii) continued to manufacture, distribute and sell to the Class the Engines after receiving substantial consumer complaints of systematic product failure; (iii) failed to disclose to the Class their actual knowledge of the defects in the Engines and the substantial likelihood the Engines would suddenly and dangerously fail within their useful life and were not of merchantable quality, (iv) failed to disclose to the Class the defective and unsafe nature of the Engines and the substantial likelihood the Engines would suddenly and dangerously fail within their useful life and were not of merchantable quality, and (v) made repeated material misstatements about the Engines' reliability and the resale value of vehicles containing the Engines.

166.     Navistar intentionally concealed or failed to disclose that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.

167.    The facts concealed or not disclosed by Navistar to Plaintiff Denis Gray and the class are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Engines.

168.    Navistar intended that Plaintiff Denis Gray and the California Class rely on its misrepresentations and omissions concerning the defective Engines, so that Plaintiff and the Class would lease or purchase vehicles containing the Engines.

169.    Plaintiff Denis Gray and the California Class justifiably acted or relied to their detriment upon the concealment or non-disclosed facts as evidenced by their purchase of the defective Engines.

170.    Had Navistar disclosed all material information regarding the defective Engines to Plaintiff Denis Gray and the California Class, they would not have purchased or leased vehicles containing the Engines or would have paid less.

171.    Navistar's unfair, unlawful, and fraudulent business practices have deceived or are likely to deceive members of the consuming public and the members of the Class.

172.    By engaging in the above-described acts and practices, Navistar has committed one or more acts of unfair competition within the meaning to Business and Professions Code § 17200, *et seq*.

173.    Navistar knowingly sold Plaintiff Denis Gray and the members of the Class Engines with defects that have rendered the Engines essentially unusable for the purposes for which they were sold.

174.    The injuries to the Classes greatly outweigh any alleged countervailing benefit to purchasers or competition under all of the circumstances.  Moreover, in light of Navistar's

exclusive knowledge of the defects, the injury is not one Plaintiff or the Class could have reasonably avoided.

175.    Navistar's acts and practices are unlawful because they violate Cal. Code §§ 1668, 1709, 1710, and Cal. Commercial Code § 2313.

176.    As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, Plaintiff and the Class have suffered actual damages in the form of expenses to continuously repair the defective Engines, diminution in value, loss of use of the Engines, and other expenses, and they are entitled to recover such damages together with all other relief allowed under Section 17200, *et seq*., plus interest, attorneys' fees and costs of suit.

**COUNT IX**
**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT,**
**RCW 19.86.020 *ET SEQ*.**
**(On Behalf of Plaintiff GTL and the Washington Class)**

177.    Plaintiff GTL incorporates all allegations of fact in all preceding paragraphs as if fully set forth herein.

178.    Plaintiff and Class members are natural persons and legal entities and, as such, constitute "persons" as defined by the CPA, RCW 19.86.010 and fall within the meaning of the term "any person" as contained in the CPA, RCW 19.86.090.

179.    By its plain terms, the CPA, RCW 19.86.090 provides a private right of action for any person who is injured in his or her business or property by an unfair and/or deceptive act or practice.

180.    Navistar engaged in unfair and/or deceptive acts or practices in violation of the CPA when it: (i) manufactured, distributed and sold to the Class the Engines that it knew or should have known contained an inherently defective and dangerous condition that caused the Engines to fail, suddenly and dangerously, within their useful life; (ii) continued to manufacture,

distribute and sell to the Class the Engines after receiving substantial consumer complaints of systematic product failure; (iii) failed to disclose to the Class their actual knowledge of the defects in the Engines and the substantial likelihood the Engines would suddenly and dangerously fail within their useful life and were not of merchantable quality, (iv) failed to disclose to the Class the defective and unsafe nature of the Engines and the substantial likelihood the Engines would suddenly and dangerously fail within their useful life and were not of merchantable quality, and (v) made repeated material misstatements about the Engines' reliability and the resale value of vehicles containing the Engines.

181.    Navistar knew or should have known that the Engines were defectively designed and/or manufactured, posed a significant and dangerous risk to the general public, would suddenly and dangerously fail before the end of their useful life, and were not suitable for their intended use.

182.    Navistar intended that Plaintiff and the Class rely on its misrepresentations and omissions concerning the defective Engines, so that Plaintiff and the Class would lease or purchase vehicles containing the Engines.

183.    Had Navistar disclosed all material information regarding the defective Engines to Plaintiff and the Class, they would not have purchased or leased vehicles containing the Engines or would have paid less.

184.    Navistar's unfair or deceptive acts occurred in Navistar's trade or business and repeatedly occurred in Navistar's trade or business and were capable of injuring and did injure a substantial portion of the general public.

185.    As a direct and proximate cause of Navistar's unfair or deceptive acts or practices, Plaintiff and the Class have suffered actual damages in the form of expenses to continuously

repair the defective Engines, diminution in value, loss of use of the Engines, and other expenses, and they are entitled to recover such damages together with appropriate penalties, including treble damages, attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, on behalf of themselves and all others similarly situated, Plaintiffs demand judgment against Navistar on each Count of the Complaint and pray for the following relief:

1.      Issue service of process and serve Navistar;

2.      Issue an Order certifying the Classes and/or any Subclasses the Court deems appropriate, appointing Plaintiffs and their counsel to represent the Classes, and directing that reasonable notice of this action be given by Navistar to all Class members;

3.      Grant any reasonable request to amend this Class Action Complaint to conform to the discovery and evidence obtained in this Class Action;

4.      Empanel a jury to try this matter;

5.      Award to Plaintiffs and the Class members all compensatory damages provided for and consistent with their claims for relief;

6.      Award to Plaintiffs and the Class members all damages and equitable relief that the Court deems appropriate.

7.      Award to Plaintiffs and the Class members all exemplary and/or punitive damages allowed by law that the Court deems appropriate;

8.      Grant the Plaintiff and Class members their reasonable attorneys' fees and costs incurred in this litigation pursuant to California Bus. & Prof. Code Section 17200, *et seq.*;

9.      Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure;

10.     Award pre-and post-judgment interest as allowed by law; and

11.     Grant Plaintiffs and Class members such further relief as the Court may deem just

and proper.

Respectfully submitted this 9th day of July, 2014.

By: /s Adam J. Levitt _____
      Adam J. Levitt

Adam J. Levitt
alevitt@gelaw.com
GRANT & EISENHOFER P.A.
30 N. LaSalle St.
Chicago, IL 60602
Phone: (312) 214-0000

By: /s Jonathan D. Selbin _____
      Jonathan D. Selbin

Jonathan D. Selbin
jselbin@LCHB.com
Jeremy M. Glapion (*pro hac vice* to be filed)
jglapion@LCHB.com
LIEFF CABRASER HEIMANN & BERNSTEIN
250 Hudson St., 8th Floor
New York, NY 10013
Phone: (212) 355-9500

Mark P. Chalos (*pro hac vice* to be filed)
mchalos@LCHB.com
LIEFF CABRASER HEIMANN & BERNSTEIN
150 Fourth Avenue North
Suite 1650
Nashville, TN 37219
Phone: (615) 313-9000

Kim D. Stephens (*pro hac vice* to be filed)
kstephens@tousley.com
Jason T. Dennett (*pro hac vice* to be filed)
jdennett@tousley.com
TOUSLEY BRAIN STEPHENS PLLC
1700 Seventh Avenue
Suite 2200
Seattle, WA 98101
Phone: (206) 682-5600

Cory S. Fein (*pro hac vice* to be filed)
CADDELL & CHAPMAN
1331 Lamar St.
Suite 1070
Houston, TX 77010
Phone: (713) 751-0400

*Counsel for Plaintiffs and all similarly situated persons and entities*